UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Happy's Pizza Franchise, LLC, a Michigan
limited liability company,

       Plaintiff,

v.                                                                          Case No. 13-11910

Chicago Partners #78, LLC, an Illinois                    Honorable Sean F. Cox
limited liability company, Harvey Holdings
#79, LLC, an Illinois limited liability
company, and Nneka Ezurike-Green,
an individual,

       Defendants.

_____/

## OPINION & ORDER

This action stems from failed business ventures to purchase and operate two Happy's

Pizza® restaurant franchises in Chicago and Harvey, Illinois.  Both businesses ceased operating

within the first three months.

Plaintiff Happy's Pizza Franchise, LLC filed this action against the two limited liability

companies that entered into Franchise Agreements with it, and one individual, asserting various

claims and seeking injunctive relief.  Those Defendants then filed counter-claims against

Happy's Pizza Franchise, LLC.

Soon after the action was filed, the parties agreed to a Stipulated Preliminary Injunction.

Discovery closed on November 13, 2013.

The matter is now before the Court on Happy's Pizza Franchise, LLC's Motion for

Summary Judgment, wherein it: 1) seeks summary judgment in its favor as to two of the five counts in its Complaint; and 2) seeks summary judgment in its favor as to all of the Counter-Claims asserted against it.  The motion has been briefed by the parties and the Court heard oral argument on March 20, 2014.  For the reasons set forth below, the Court shall: 1) DENY the motion as to Counts III and IV of Happy's Pizza Franchise, LLC's Complaint because Plaintiff has not met its burden of establishing that it is entitled to summary judgment as to those counts; and 2) GRANT the motion as to the Counter-Claims and dismiss all Counter-Claims asserted in this action.

## BACKGROUND

On April 29, 2013, Plaintiff Happy's Pizza Franchise, LLC filed this action asserting claims against the following three Defendants: 1) Chicago Partners #78, LLC; 2) Harvey Holdings #79, LLC; and 2) Nneka Ezurike-Green.

### Plaintiff's Complaint

Plaintiff's Complaint asserts the following claims: 1) "Statutory and Common Law Trademark Infringement Against All Defendants" (Count I); 2) "Statutory and Common Law Unfair Competition Against All Defendants" (Count II); 3) "Breach of Franchise Agreements Against All Defendants" (Count III); 4) "Action for Injunction Against All Defendants" (Count IV); and 5) "Declaratory Judgment Action Against All Defendants" (Count V).

The docket reflects that both sides have made a jury demand, although all requests for declaratory relief would be decided by the Court.

### The Counter-Claims

On May 6, 2013, Defendants filed an Answer and Counter-Complaint.  (Docket Entry

2

No. 15).  In their Counter-Complaint, Defendants asserted the following counter-claims against Happy's Pizza Franchise, LLC:  1) "Breach of Contract as to Chicago Partners #78, LLC" (Count I); 2) "Fraud as to Chicago Partners #78, LLC" (Count II); 3) "Punitive Damage as to Chicago Partners #79, LLC" (Count III); 4) "Breach of Contract as to Harvey Holdings #79, LLC" (Count IV); 5) "Fraud as to Harvey Holdings #79, LLC" (Count V); 6) "Punitive Damage as to Harvey Holdings #79, LLC" (Count VI); and 7) and untitled "Count VII" which asserts a claim for breach of the implied covenant of good faith and fair dealing under Michigan law.

**The Parties Agreed To A Stipulated Preliminary Injunction**

Upon filing the action, Plaintiff also sought a temporary restraining order and/or a preliminary injunction.  The parties ultimately agreed to a Stipulated Preliminary Injunction (Docket Entry No. 22) on May 20, 2013, in which Defendants agreed not to operate a competing business at the locations at issue and agreed not to use Happy's marks and protected materials.

**The Pending Motion For Summary Judgment**

On May 15, 2013, this Court issued the Scheduling Order in this action that provides that discovery is to close on November 13, 2013, and that the deadline for filing motions is December 16, 2013.  (Docket Entry No. 25).

After the close of discovery, on December 16, 2013, Plaintiff filed its motion for summary judgment.

The following material facts are gleaned from the evidence submitted by the parties, taken in the light most favorable to Plaintiffs/Counter-Defendants, the nonmoving party.

**The Parties**

There are only four named parties in this action: 1) Plaintiff/Counter-Defendant Happy's

Pizza Franchise, LLC; 2) Defendant/Counter-Plaintiff Chicago Partners #78, LLC; 3) Defendant/Counter-Plaintiff Harvey Holdings #79, LLC; and 4) Defendant/Counter-Plaintiff Nneka Ezurike-Green ("Green").

Happy's Pizza Franchise, LLC ("Happy's") is a Michigan limited liability company with its principal place of business in Michigan. (Pl.'s Compl. at ¶ 1; Defs.' Answer at ¶ 1). Happy's offers and sells Happy's Pizza® restaurant franchises. (Pl.'s Compl. at ¶ 8; Defs.' Answer at ¶ 8).

Happy Asker ("Asker") is the founder and managing member of Happy's. Asker also owns and/or operates several other business entities. Asker is not named as a party in this action.

("Chicago Partners") is an Illinois limited liability company with its principal place of business at 8710-8718 Halsted Ave., Chicago, Illinois 60620. (Pl.'s Compl. at ¶ 2; Defs.' Answer at ¶ 2). Chicago Partners was created in 2012, with two members: 1) AIC & KA, Inc.; and 2) National Asset Partners, LLC. Green is the President and owner of AIC & KA, Inc. Asker is a member and co-manager of National Asset Partners, LLC. AIC & KA, Inc. owns 80% of Chicago Partners. (*See* Chicago Partners Franchise Agreement at Appendix B). National Asset Partners, LLC owns 20% of Chicago Partners. (*Id*.).

Harvey Holdings #79, LLC ("Harvey Holdings") is an Illinois limited liability company with its principal place of business at 15900 Halsted Ave., Harvey, IL 60426. (Pl.'s Compl. at ¶ 3; Defs.' Answer at ¶ 3). Harvey Holdings was created in 2012, with two members: 1) AIC & KA, Inc.; and 2) National Asset Partners, LLC. Asker is a member and co-manager of National Asset Partners, LLC. AIC & KA, Inc. owns 80% of Harvey Holdings. (*See* Harvey Holdings Franchise Agreement at Appendix B). National Asset Partners, LLC owns 20% of Harvey

4

Holdings.  (*Id.*).

Green is the President and a Co-Manager of both Chicago Partners and Harvey Holdings.

**Agreements Chicago Partners Entered Into**

In order to start operating a Happy's Pizza® restaurant franchise, Chicago Partners entered into multiple contracts with Happy's, and with other entities that are not parties to this action.

In November of 2012, Chicago Partners entered into an "Asset Purchase And Sale Agreement" with "Happy's Pizza Chicago #3, Inc., a Michigan corporation."  (Ex. A to Pl.'s Br.; Ex. K to Defs.' Br.).  Happy's Pizza Chicago #3, Inc. is not a party to this action.  That agreement states that the seller, "Happy's Pizza Chicago #3, Inc.", owns and operates a Happy's Pizza Franchise located at 8710 S. Halsted in Chicago, Illinois and that it is selling "all of the assets of Seller's Business," except those excluded under the agreement.  Under this agreement, Chicago Partners bought all of the furniture, fixtures, displays, and tangible asserts, as well as food and other inventory of the business.  Among other things, this agreement requires Chicago Partners to: 1) "obtain a Happy's Pizza Franchise from Happy's Pizza Franchise, LLC"; and 2) enter into a lease agreement with the landlord of the franchise location.  (*Id.* at § 3.1 & § 4.5).  Asker signed this agreement on behalf of Happy's Pizza Chicago #3, Inc. and Green signed it on behalf of Chicago Partners.

On January 1, 2013, Chicago Partners entered into a "Franchise Agreement" with Happy's.  (Ex. D to Pl.'s Br.; Ex. E to Defs.' Br.).  Some of the relevant provisions in this 57-page Franchise Agreement are included here.

Article 4 of the Franchise Agreements governs fees, reports, access and audit.  Paragraph

5

4.1 provides that the franchisee must pay an initial franchise fee at the time of signing of this Agreement in the amount of $35,000.  The initial franchise fee is payable in full at the time of signing of this Agreement.  The initial franchise fee is considered earned at the time of signing of this Agreement.  (*Id*. at ¶ 4.1).

Article 4.2 provides, in pertinent part, that "Franchisee must pay Franchisor a royalty fee in an amount equal to four percent (4%) of Franchisee's Gross Revenues.  Franchisee must report Gross Revenues and pay royalty monthly, in the manner specified in Section 4.9, by the 5th business day of the month based on Gross Revenues for the preceding calendar month.  Franchisee agrees that royalty payments must be paid daily or weekly, instead of monthly, if specified by the Franchisor."

Article 4.3 pertains to "Local Advertising Fee" and provides that "Franchisee must pay a weekly local advertising fee to Franchisor or an advertising company designated or approved by Franchisor, which may be an affiliate of Franchisor. The amount of the weekly local advertising fee will be specified by Franchisor, but will not exceed $1,000 per week without Franchisee's consent."

Article 4.10 provides that "Franchisee's obligations for the full and timely payment of the fees described in this Agreement and all other amounts owed to Franchisor are absolute and unconditional.  Franchisee must not delay or withhold the payment of all or part of those amounts based on the alleged nonperformance by Franchisor or for any other reason or put the fees or other amounts in escrow or setoff against any claims Franchisee may allege against Franchisor.

Article 8.5 is titled "Specifications and Designed Suppliers for Products and Services" and provides, in pertinent part, that:

6

>In order to maintain uniqueness, consistency, uniformity, quality and identity of Restaurants and the products and services offered and sold by Restaurants and the group purchasing power of Restaurants, Franchisee must comply with the product, service and supply requirements set forth in this Section.

>Franchisees must purchase all equipment, fixtures, signs, inventory, food products, packaging materials, paper and plastic products, menus, uniforms, insurance, and all other products and services used in the development and operation of the Franchisee Business in accordance with Franchisor's specifications and only from Franchisor or supplier or distributor designated by Franchisor.

(Article 8.5 of Franchise Agreements).

Article 11.2 is titled "Ownership and Use of Confidential Information" and provides, in pertinent part, that the franchisee will "[r]equire Franchisee's employees and agents to sign an agreement relating to confidentiality and/or non-competition in the form specified by Franchisor before revealing any aspect of the Confidential Information to the employee or agent.  Franchisor has the right to be a third party beneficiary of those agreements with independent enforcement rights."  (Article 11.2(e) of Franchise Agreements).

The Franchise Agreements specify events of default for which there is no right to cure before the Franchise Agreement can be terminated by Happy's and events of default with a right to cure before Happy's can terminate the agreement.

Article 14.3 lists the events that constitute a default by the franchisee that constitute good cause for termination of the franchise agreement "without affording Franchisee an opportunity to cure," they include:

>(f)     A substantial number of complaints from customers relating to products or services provided by Franchisee or the acts or omissions of Franchisee

>(g)     Failure to have employees and agents sign an agreement relating to confidentiality and/or non-competition in the form specified by Franchisor

as a condition of employment of the employee or agent.

. . . .

(o)    Franchisee operates the Franchise Business in a manner that presents a health or safety hazard to its customers, employees, or the public.

. . . .

(r)    Franchisee is unable to pay its debts or obligations as they become due or files voluntary petition in bankruptcy or is adjudicated bankrupt or insolvent or makes an assignment for the benefit of creditors.

(Article 14.3 of Franchise Agreement).

Article 14.4 specifies events that constitute a default by the Franchisee and good cause to terminate the Franchise Agreement "if the Franchisee fails to cure the default" during the cure period and they include:

(a)    Failure of Franchisee to promptly pay its obligations to Franchisor, *an affiliate of Franchisor or third party suppliers* as they become due, or the occurrence of any other default under a lease or finance agreement for the real or personal property involved in the Franchise Business.

. . . .

(c)    Failure of Franchisee to purchase products and services for use in the Franchise Business from suppliers designated by Franchisor.

. . . .

(e)    Any other material breach of this Agreement by Franchisee . . .

(Article 14.4 of Franchise Agreement) (emphasis added).

Article 14.5 provides that the Franchisor has the right to terminate the agreement before its expiration for good cause, which includes the events of default specified above. If the Franchisor terminates the agreement, the Franchisee must immediately cease using Happy's marks and confidential materials. (Article 15.1 of Franchise Agreement). Article 15.4, titled "Surviving Obligations," provides:

*Termination or expiration of this Agreement will not affect Franchisee's obligations or liability to Franchisor for amounts owed to Franchisor under this*

8

> *Agreement or for Franchisor's damages attributable to the loss of bargain*
> *resulting from termination of this Agreement before its expiration (as set forth in*
> *Section 15.5).*  Also, termination of this Agreement will not affect Franchisee's
> obligations under Article 6 relating to the Franchise Marks, Section 8.13 relating
> to indemnification, Article 11 relating to confidentiality, Article 12 relating to
> restrictions on competition, Section 15.3 relating to Franchisor's option to
> purchase the Franchise Business, Article 16 relating to dispute resolution and
> other obligations in this Agreement or any other agreements between the parties,
> which, by their terms of intent, survive termination or expiration of this
> Agreement.

(Article 15.4 of Franchise Agreement) (emphasis added).  Article 15.5, titled "Damages for Loss

of Bargain" provides, in pertinent part, that:

> In addition to any other remedies available to Franchisor, if this Agreement is
> terminated before its expiration (other than termination by Franchisee for cause),
> Franchisor will be entitled to recover from Franchisee damages attributable to the
> loss of the bargain resulting from that termination.  The parties stipulate and agree
> that the *damages for Franchisor's loss of bargain will be the present value of the*
> *royalty fees that would have been payable to Franchisor for the lesser of: (i) the*
> *balance of the term of this Agreement if this Agreement had not been terminated;*
> *or (ii) 36 months.*

(Article 15.5 of Franchise Agreement) (emphasis added).

Article 16.3 provides that the agreement will be interpreted and construed under the laws

of Michigan.

Article 16.6 provides that if Happy's takes legal action to enforce the agreements, and is

the prevailing party, it can recover its attorney fees and expenses.  It does not provide for such

award if the franchisee prevails.

Article 17.2 governs "Representations by Franchisor" and states:

> *Franchisee acknowledges and agrees that, except as specifically set forth in this*
> *Agreement or the Franchisor's Franchise Disclosure Document or the attached*
> *"Acknowledgments by Franchisee," no representations or warranties, express or*
> *implied, have been made to Franchisee, either by Franchisor or anyone acting on*
> *its behalf or purporting to represent it*, including, but not limited to, the prospects

9

for successful operations, the level of business or profits that Franchisee might reasonably expect, the desirability, profitability or expected traffic volume or profit of the Franchise Business.  Franchisee acknowledges that all such factors are necessarily dependent upon variables beyond Franchisor's control including, without limitation, the ability, motivation and amount and quality of effort expended by Franchisee.  Franchisee acknowledges that neither Franchisor nor any of its agents or representatives have made or are authorized t make any oral, written or visual representations or projections of actual or potential sales, earnings, net or gross profits, operational costs or expenses, prospects or chances of success that are not contained in this Agreement or in the Franchisor's Franchise Disclosure Document.  Franchisee agrees that it has not relied on and that Franchisor will not be bound by allegations of any representations as to earnings, sales, profits, costs, expenses, prospects or chances of success that are not contained in this Agreement or the Franchisor's Franchise Disclosure Document.

(Article 17.2 of Franchise Agreement) (emphasis added).

Article 19.7, titled "Entire Agreement; Modifications" states:

*This Agreement and all appendices and other documents attached to this Agreement which are incorporated in this Agreement, will constitute the entire agreement between the parties.  This Agreement supercedes and replaces any and all previous or contemporaneous written and oral agreements or understandings, promises, representations or dealings between the parties.*  However, nothing in this Section or otherwise in this Agreement is intended to disclaim or waive Franchisee's reliance on any authorized statements made in the Franchise Disclosure Document delivered to Franchisee or in the exhibits and amendments to the Franchise Disclosure Document.  This Agreement may not be amended or modified except in writing signed by both parties, except as provided in Section 19.7 below and except that Franchisor may unilaterally modify the Franchise System and its specifications as provided in this Agreement.

(Article 19.1 of Franchise Agreement) (emphasis added).

Later in January of 2013, Chicago Partners and Happy's entered into a written Addendum to Happy Pizza Franchise, LLC Franchise Agreement (Ex. C to Defs.' Counter-Complaint). Among other things, that Addendum states that "[o]nce the franchise fee has been paid, no portion of the franchise fee is refundable."  (*Id*. at 1).  It also appears to provide that Illinois law

will govern.  (*Id.* at ¶ 4).

On January 1, 2013, Green, acting individually, and Asker, acting individually, signed a written "Personal Guaranty" (Ex. F to Pl.'s Br.) under which they guaranteed all existing and future indebtedness of Chicago Partners to Happy's.  Although Asker signed the Personal Guaranty along with Green, the guaranty provides that the Franchisor (Happy's) "in its sole discretion, may release any one or more of the Guarantors."  (*Id.* at ¶ 3).

On January 1, 2013, Chicago Partners also entered into a Lease Agreement with "Halstead Property, LLC, a Michigan limited liability company authorized to conduct business in Illinois as Happy's Halstead Property, LLC ("Landlord") to rent certain premises in Chicago, Illinois.  (Ex. B to Pl.'s Br. ).  Asker signed that Lease Agreement as the authorized representative of Halstead Property, LLC.

### Agreements Harvey Holdings Entered Into

In order to start operating a Happy's Pizza® restaurant franchise, Harvey Holdings also entered into multiple contracts with Happy's, and with other entities that are not parties to this action.  It entered into the same series of contracts that Chicago Partners entered into.

In November of 2012, Harvey Holdings entered into an "Asset Purchase And Sale Agreement" with "HP Harvey Chicago #4, Inc., a Michigan corporation."  (Ex. A to Pl.'s Br.). HP Harvey Chicago #4, Inc. is not a party to this action.  That agreement states that the seller, HP Harvey Chicago #4, Inc., owns and operates a Happy's Pizza Franchise located at 15900 S. Halsted, in Harvey, Illinois, and that it is selling "all of the assets of Seller's Business," except those excluded under the agreement.  Under this agreement, Chicago Partners bought all of the furniture, fixtures, displays, and tangible asserts, as well as food and other inventory of the

11

business.  Among other things, this agreement requires Chicago Partners to: 1) "obtain a Happy's Pizza Franchise from Happy's Pizza Franchise, LLC"; and 2) enter into a lease agreement with the landlord of the franchise location.  (*Id.* at § 3.1 E & § 4.5).  Asker signed this agreement on behalf of HP Harvey Chicago #4, Inc. and Green signed it on behalf of Chicago Partners.

On January 1, 2013, Harvey Holdings entered into a "Franchise Agreement" with Happy's.  (Ex. E to Pl.'s Br.).  This Franchise Agreement contains the same provisions as the Franchise Agreement that Chicago Partners entered into with Happy's.

Later in January of 2013, Harvey Holdings and Happy's entered into a written Addendum to Happy Pizza Franchise, LLC Franchise Agreement (Ex. G to Defs.' Counter-Complaint). Among other things, that Addendum states that "[o]nce the franchise fee has been paid, no portion of the franchise fee is refundable."  (*Id.* at 1).  It also appears to provide that Illinois law will govern.

On January 1, 2013, Green, acting individually, and Asker, acting individually, signed a written "Personal Guaranty" (Ex. F to Pl.'s Br.) under which they guaranteed all existing and future indebtedness of Harvey Holdings to Happy's.  Although Asker signed the Personal Guaranty along with Green, the guaranty provides that the Franchisor (Happy's) "in its sole discretion, may release any one or more of the Guarantors."  (*Id.* at ¶ 3).

On January 1, 2013, Harvey Holdings entered into a Lease Agreement with HP Harvey Property #4 Chicago, LLC, a Michigan limited liability company ('Landlord')" to rent certain premises in Harvey, Illinois.  (Ex. B to Pl.'s Br.; Ex. D ).  Asker signed that Lease Agreement as the authorized representative of HP Harvey Property #4 Chicago, LLC.

**Happy's Sends Chicago Partners and Harvey Holdings Default Notices**

In March of 2013, Happy's sent both Chicago Partners and Harvey Holdings written default notices.

On March 14, 2013, Happy's sent Chicago Partners a letter serving as formal notice that it is in default of the Franchise Agreement. (Ex. J to Pl.'s Br.). That letter stated that Chicago Partners was in default as to Article 14.3 subsections (b) and (d):

> 14.3
> (b) franchisor determines that Franchisee cannot will not or has not completed Franchisor's pre-opening training programs to the satisfaction of Franchisor, or fails to demonstrate the qualities and abilities that Franchisor deems necessary for the successful operation of the Franchise Business.
> It has come to our attention of our corporate office that numerous policies set forth in the franchise agreement, operations manual and food prep guide are not being followed. Examples of these, can be found below.
>
> (d) Any material misrepresentation or dishonesty by Franchisee
>
> It has come to the attention of the corporate office that the franchisee is not ordering foods from our required distributor, although the franchisee is stating that they are. It has also come to the attention of our corporate office that the franchise business has taken their computer systems offline and access to these systems are required by the franchise agreement. The franchisee has indicated that the systems are offline due to an internet provider change, which is not a valid reason . . .

(*Id*. at 1). The letter also asserts that Chicago Partners has breached subsections (f), (g), and (o) of Article 14.3, stating:

> (f) A substantial number of complaints from customers relating to products or services provided by Franchisee or the acts of omissions of Franchisee.
> The corporate office has received a number of complaints due to poor customer services and quality of product. Examples of such complaints are enclosed.
>
> (g) Failure to have employees and agents sign an agreement relating to confidentiality and/or non-competition in the form specified by Franchisor as a condition of employment of the employee or agent.

Confidentiality and non competition agreements have not been provided for all employees or agents fo the franchise restaurant by the franchisee to the corporate office.

(o) Franchisee operates the Franchise Business in a manner that presents a health or safety hazard to its customers, employees, or the public.
It has come to the attention of the corporate office that the restaurant is being kept in an unclean condition.

(*Id*. at 2).

The letter also asserts that Chicago Partners has violated Article 14.4 (a), failing to pay obligations as due, including obligations under lease or to third parties. (*Id*. at 2-3). It asserts that the following amounts are past due:

| Vendor | Chicago 78 | Amount Owing |
|--------|-----------|--------------|
| Happy's Pizza Franchise, LLC | January Accounting | 325.00 |
| Happy's Pizza Franchise, LLC | February Accounting | 325.00 |
| Happy's Pizza Franchise, LLC | March Accounting | 325.00 |
| Landlord | February Rent | 4,011.18 |
| Landlord | March Rent | 4.011.18 |
| Happy's Pizza Franchise, LLC | Advertising 2/24 | 669.00 |
| Happy's Pizza Franchise, LLC | Advertising 2/10 | 69.00 |
| Happy's Pizza Franchise, LLC | Advertising 3/10 | 47.00 |
| Total Due to Vendors: | | 9,782.36 |

(*Id*. at 3).

The letter informs Chicago Partners that they must cure all defaults within ten (10) days or the Franchise Agreement will be automatically terminated.

On March 14, 2013, Happy's sent a nearly identical letter to Harvey Holdings. (Ex. J to Pl.'s Br.). Like the letter sent to Chicago Partners, it stated that Harvey Holdings is in default as to subsections (b) and (d) of Article 14.3 and subsections (f), (g), and (o) of Article 14.4. It also states that Harvey Holdings owes the following amounts:

14

| Vendor | Chicago 78 [sic] | Amount Owing |
|---|---|---|
| Happy's Pizza Franchise, LLC | January Accounting | 325.00 |
| Happy's Pizza Franchise, LLC | February Accounting | 325.00 |
| Happy's Pizza Franchise, LLC | March Accounting | 325.00 |
| Landlord | February Rent | 3,500.00 |
| Landlord | March Rent | 3,500.00 |
| Happy's Pizza Franchise, LLC | Advertising 2/24 | 681.00 |
| Happy's Pizza Franchise, LLC | Advertising 2/10 | 69.00 |
| Happy's Pizza Franchise, LLC | Advertising 3/10 | 456.36 |
| Total Due to Vendors: | | 9,181.36 |

(Ex. J. at 9)


**Happy's Sends Chicago Partners and Harvey Holdings Termination Notices**

On April 12, 2013, Happy's sent Chicago Partners a letter advising it that, as of March 26, 2013, its Franchise Agreement had been terminated.  (Ex. K to Pl.'s Br.).  The letter demanded that Chicago Partners cease operating the restaurant and comply with the termination provisions in the Franchise Agreement.

On April 12, 2013, Happy's sent the same termination letter to Harvey Holdings.  (Ex. K to Pl.'s Br. at 9-10).

**Standard Of Decision**

Under Fed. R. Civ. P. 56(a), summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"No genuine dispute as to any material fact exists where the record 'taken as a whole could not lead a rational trier of facts to find for the non-moving party.'" *Shreve v. Franklin County, Ohio*, __ F.3d __, 2014 WL 463477 (6th Cir. 2014) (citing *Matsushita Elec. Indus., Co.*

15

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Ultimately, the court evaluates 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Shreve, supra* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

On summary judgment, the Court views the facts and draws all inferences in the light most favorable to the non-moving party. *Id*. Fed. R. Civ. P. 56(c)(1) provides:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)   citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Rule 56 also provides that the court can grant summary judgment for a non-movant, or grant summary judgment on a ground not raised by a party, so long as the Court gives notice and a reasonable opportunity to respond:

> (f) Judgment Independent of the Motion. After giving notice a reasonable time to respond, the court may:
>
> > (1)   grant summary judgment for a nonmovant;
> > (2)   grant the motion on grounds not raised by a party; or
> > (3)   consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f).

**ANALYSIS**

Happy's Amended Motion for Summary Judgment asserts that: 1) it is entitled to summary judgment as to Counts III and V of its Complaint; and 2) it is entitled to summary judgment in its favor as to all of the Counter-Claims asserted against it.

**I.      Is Happy's Entitled To Summary Judgment In Its Favor As To Counts III Or V Of Its Complaint?**

In the pending motion, Happy's seeks summary judgment in its favor as to Counts III and V of its Complaint.

**A.      Count III – Happy's Claim For Breach Of Franchise Agreements**

Count III of Plaintiff's Complaint is its claim for "Breach of Franchise Agreements." The two franchise agreements are the only contracts that form the basis of this count.[1]  In order to establish a breach of contract claim under Michigan law, the plaintiff must establish the existence of a valid contract, the terms of the contract, the specific actions that breached those terms, and the damages that the breach caused to the plaintiff. *Brigolin v. Blue Cross Blue Shield of Michigan*, 516 F. App'x. 532, 536 (6th Cir. 2013) (citing *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003)).

**1.      Are The Franchise Agreements Valid Contracts?**

Although in their *response brief* Chicago Partners and Harvey Holdings assert that they "are entitled to rescission of the Franchise Agreements," (Defs.' Br. at 22), they did not include a

---

[1]Although the body of Count III acknowledges that the franchise agreements were entered into by Chicago Partners and Harvey Holdings, the title of the count indicates this breach of contract claim is also being asserted against Green, in addition to Chicago Partners and Harvey Holdings.

17

claim for rescission in their Counter-Complaint or file a motion in this action seeking rescission. Rather, their Counter-Complaint includes a breach of contract claim based upon the same franchise agreements.   As such, Happy's motion asserts that "[n]either party disputes that the Franchise Agreements were valid contracts."  (Pl.'s Br. at 13).

### 2.	What Terms Of The Contract Were Breached?

In order to prevail on its breach of contract claims, Happy's must establish the terms of the contract and establish that the terms that have been breached.  Happy's identifies several of the provisions of the Franchise Agreement that it claims Chicago Partners and Harvey Holdings breached, which are discussed below.

### a.	Failure to Purchase Approved Supplies

Happy's asserts that Defendants breached Article 7.6 & 8.5 of the Franchise Agreements by failing to purchase approved restaurant supplies and inventories.  It identifies, as the evidence to support that allegation, two items.

First, it directs the Court to the Declaration of Christina Rice, the Vice-President of Franchise Development for Happy's ("Rice"), which is attached as Exhibit G.  Without further explanation as to what was required and what was purchased instead, or when it was done, Rice's Declaration states that "Defendants refused to purchase food items from approved vendors, and instead purchased non-conforming, non-approved food items."  (Rice Decl. at ¶ 4).

Second, Happy's directs the Court to Exhibit H to its motion.  That exhibit contains several pages of photographs. On each page, there are two photographs.  Each page has handwriting that flags the top photograph as "Defendants" and the bottom photograph as "Proper."  Happy's does not present an affidavit or a declaration to establish who took these

photographs, where they were taken, when they were taken, or what they purportedly show.

In response, Chicago Partners and Harvey Holdings assert that they purchased products and services as required in the Franchise Agreements (Defs.' Br. at 14). In addition, Green submitted a Declaration that states "I did not use non-conforming substandard food items as alleged by the Franchisor." (Ex. P to Defs.' Br., at ¶ 56).

Accordingly, the Court finds there is a factual dispute as to this alleged breach.

> **b.      Failure To Pay Royalty Fees And Accounting And Advertising Fees**

Happy's asserts that Chicago Partners and Harvey Holdings failed to pay it for franchise royalty fees, and accounting and advertising fees, in violation of Articles 4.2, 4.3, and 4.10 of the Franchise Agreements. It identifies, as the evidence to support that allegation, two items of evidence. First, it directs the Court to Rice's Declaration. It does not specify any particular portions of her Declaration, but the following paragraphs appear to be what Happy's intended the Court to look at:

> 8.      Defendants failed to pay the monthly franchise fees owing to Franchisor.
> . . . .
>
> 10.     As of May 8, 2013, Chicago Partners owed Franchisor $22,535.06, as evidenced below:
> - Rent paid to Landlord (March-May)            $16,044.72
> - *Advertising fees (February-April)*            *$1,554.00*
> - *Franchise fees (March-May)*                    *$3,000.00*
> - Invoices paid by Franchisor                    $1,936.34
> . . . .
>
> 16.     As of May 8, 2013, Defendant Harvey Holdings owed Franchisor $19,663.82, as evidenced below:
> - Rent paid to Landlord (March-May)            $14,000.00
> - *Advertising fees (February-April)*            *$1,599.00*
> - *Franchise fees (March-April)*                  *$3,000.00*

19

- Invoices paid by Franchisor                    $1,064.82

(Rice Decl.) (Emphasis added).

Second, Happy's directs the Court to Exhibit J to its brief, which consists of: 1) the

March 14, 2013 notice of default letter to Chicago Partners from Rice, which states amounts

allegedly owed; 2) a March 14, 2013 notice of default letter to Harvey Holdings from Rice,

which states amounts allegedly owned; and 3) two e-mails regarding complaints.

In response, Chicago Partners and Harvey Holdings deny breaching the Franchise

Agreements and Green's Declaration states that Happy's "collected in advertising fees the sum of

$6,087.18 from Harvey restaurant and $5,680.00 from the Chicago restaurant."  (Green Decl. at ¶

82).  Green's Declaration states "I paid to the Franchisor all royalties, franchise fees, local

advertising fees, advertising fund contributions, reimbursement for purchases from SOFO and

Pepsi as per the franchise agreement as they became due and was therefore not in breach of the

Franchise Agreement."  (Green Decl. at ¶ 38).

The finds there is a factual dispute as to this alleged breach.

### c.    Failure To Pay Rent And Invoices To Third Parties

Happy's brief lists, as one of the alleged breaches of the Franchise Agreements: "Failure

to keep current on monthly rent and invoices from third-party vendors for Franchise Locations

(Exhibit G; Exhibit J)."  (Pl.'s Br. at 13).

As to Rice's Declaration, Happy's Brief does not specify any particular portions of her

Declaration, but the following paragraphs appear to be what Happy's intended the Court to look

at:

7.    Defendants failed to remain current on their monthly rent to their

landlords, and which caused Franchisor to make their rental payments on behalf of Defendants.

. . . .

10.     As of May 8, 2013, Chicago Partners owed Franchisor $22,535.06, as evidenced below:

- *Rent paid to Landlord (March-May)*        *$16,044.72*
- Advertising fees (February-April)          $1,554.00
- Franchise fees (March-May)                 $3,000.00
- *Invoices paid by Franchisor*              *$1,936.34*

. . . .

16.     As of May 8, 2013, Defendant Harvey Holdings owed Franchisor $19,663.82, as evidenced below:

- *Rent paid to Landlord (March-May)*        *$14,000.00*
- Advertising fees (February-April)          $1,599.00
- Franchise fees (March-April)               $3,000.00
- *Invoices paid by Franchisor*              *$1,064.82*

(Rice Decl.) (Emphasis added).  Rice's declaration does not specify who the "invoices paid by Franchisor" were paid to or what they were paid for.

Happy's brief asserts that the "failure to stay current with monetary obligations is in violation of Sections 4.2, 4.3, and 4.10 of the Franchise Agreements."  (Pl.'s Br. at 6).  Happy's Brief does not identify any language in those Articles that makes it a breach of the Franchise Agreement if the franchisor fails to pay rent or other amounts *owed to third parties*, such as the franchisee's landlord, or any provision that allows Happy's to make such payments to third parties and then bill the franchisee for such amounts.

Nevertheless, the Court sees that there is a provision that makes the franchisee's failure to pay its landlord or third parties for suppliers *an event of default* that allows Happy's to terminate the Franchise Agreement:

a)      Failure of Franchisee to promptly pay its obligations to Franchisor, an

21

> affiliate of Franchisor or third party suppliers as they become due, or the
> occurrence of any other default under a lease or finance agreement for the
> real or personal property involved in the Franchise Business.

(Section 14.4 (a) of Franchise Agreement).  So the failure of either Chicago Partners or Harvey

Holdings to pay rent to their landlord or pay third party suppliers, if established, allows Happy's

to terminate the franchise agreement.  That said, the Court does not see any provision that allows

Happy's to go ahead and pay the debt owed to the third party and then recover it from the

franchisee.

In addition, Defendant's submitted a Declaration from Green that states: "I paid to the

Franchisor all royalties, franchise fees, local advertising fees, advertising fund contributions,

reimbursement for purchases from SOFO and Pepsi as per the franchise agreement as they

became due and was therefore not in breach of the Franchise Agreement."  (Green Decl. at ¶ 38).

Green's Declaration also states " I had the ability to pay the restaurants' debts or obligations as

they became due and, in fact, I paid the restaurants' obligations to Franchisor, affiliates of

Franchisor, or third party suppliers as they became due."  (Green Decl. at ¶ 64).

Based on what has been submitted to the Court, there appears to be a factual dispute as to

these alleged breaches.

### d.      Failure To Permit Franchisor To Access Point-Of-Sale System

Section 4.12 requires the franchisee to allow Happy's access to its point-of-sale system.

This Article is not, however, an event that constitutes a default without allowing the opportunity

to cure.  It is also not specifically included as an event that allows Happy's to terminate after

allowing time for cure, but the Franchise Agreement has a catch-all provision that allows it to

terminate for "any other material breach of this agreement" provided the franchisee is given an

opportunity to cure.  (Article 14.4(e) of Franchise Agreement).

Happy's identifies, as the evidence to support this alleged breach, Rice's Declaration and the default notices.  It does not specify any particular portions of Rice's Declaration, but the following paragraph appears to be what Happy's intended the Court to look at: "Defendant took their computer and point-of-sale system offline, which prevented Franchisor from assessing these systems, as required by the Franchise Agreements."  (Rice Decl. at ¶ 5).  Notably, Rice's Declaration does not state when or where (i.e., which of the two franchise locations) this occurred, or for how long.

In opposing the motion, Defendants submitted a Declaration from Green.  Green's Declaration states that "Franchisor was well aware that during the three (3) months that the restaurants were operational, I had problem temporarily for a day or two with the point-of-sale system due to technical difficulties with her IT contractor."  (Green Decl. at ¶ 54).  It further states, "I advised Franchisor of the technical problem which was taken care of immediately."  (*Id*. at ¶ 55).

Based on what has been presented, the Court finds that Happy's has not established that either of the Defendants committed a material breach, and failed to cure it within 10 days, based on this alleged breach.

### e.      Failure To Obtain Confidentiality Agreements From Employees

Next, Happy's asserts that the franchisees failed "to obtain signed Confidentiality Agreements from employees, as required by § 11.2 of the Franchise Agreements (Exhibit G)." (Pl.'s Br. at 13).  Rice's Declaration states that "Defendants failed to obtain signed

confidentiality agreements from their employees, as required by the Franchise Agreements."
(Rice Decl. at ¶ 9).

    In response to the pending motion, Defendants assert that Green had her employees sign
the confidentiality forms as a condition of their employment at the restaurants.  Copies of the
Confidentiality Agreements signed by the hired employees at the Chicago and Harvey restaurants
marked Exhibit 'FF' and 'GG' respectively are attached hereto."  (Defs.' Br. at 14).  In addition,
Defendants submitted a Declaration from Green that states: "I had my employees sign the
confidentiality forms as a condition of their employment at the restaurants."  (Green Decl. at ¶
62).

    The Court finds there is a factual dispute as to this alleged breach.

### f.    Customer Complaints

    The last alleged breach that Happy's asserts is that Defendants operated the "restaurants
in a manner which received complaints from customers regarding food quality and service, in
violation of § 4.14 and § 4.4 of the Franchise Agreements (Exhibit I)."  (Pl.'s Br. at 13).

    Article 4.4 relates to advertising fund contributions and Article 4.14 allows Happy's to
inspect franchise premises.  But Happy's does not allege that Defendants failed to allow an
inspection.

    Rather, this alleged breach appears to go to another Article of the Franchise Agreement.
Article 14.3 provides that the following is an event of default by the franchisee and good cause to
terminate the agreement without an opportunity to cure: "A *substantial number* of complaints
from customers relating to products or services provided by Franchisee or the acts or omissions
of Franchisee."  (emphasis added).

Attached as Exhibit I to Happy's Brief are two e-mails that appear to contain two complaints – both of which were made as to the restaurant operated by Harvey Holdings.  There is no affidavit or declaration that tells the Court where these documents came from but they appear to be complaints submitted by customers through some sort of website maintained by Happy's.

The first complaint, made as to the store location "harvey" states: "I called maybe more than ten times and the phone rang for a long time.  I thought something was wrong with my phone so I called from two other phones and still no answer.  They didn't even put me on hold. They just let the phone ring."  This appears to have occurred on or before February 16, 2013.

The second complaint, made as to the store location at "159th Halsted," which is the store operated by Harvey Holdings, states:

> So last night I called ahead and ordered 6 jumbo chicken wings (pretty good). I was told it would take 25 minutes.  I showed up 25 minutes later and then was told it would take another 9 minutes.  This suggests to me that they did not start making my order until well after I placed the call.  Waiting at least half an hour (and it was probably longer) for 6 jumbo chicken wings is unacceptable! I could've gone to a number of your competitors and gotten my order anywhere from immediately to 15 minutes tops. THIS WAS THE WORST SERVICE I HAVE EVER EXPERIENCED, SO THIS WILL BE THE LAST TIME I WILL EVER VISIT HAPPY'S PIZZA!!

(Ex. J).

The Court finds that Happy's has not submitted any evidence regarding complaints that relate to the restaurant operated by Chicago Partners.  Thus, Happy's has not established that Chicago Partners breached the Franchise Agreement by virtue of having received complaints.

In addition, as to Harvey Holdings, Happy's has submitted evidence that it received just two complaints about the restaurant it was operating.  Thus, there is a question of fact as to this

25

breach and the trier of fact will determine whether the two complaints at issue constitute "a substantial number" of complaints.

Accordingly, the Court finds that Happy's is not entitled to summary judgment as to Count III of its Complaint.[2]

### B.    Count V – Happy's Claim For Declaratory Relief

Count V of Plaintiff's Complaint is its request for "Declaratory Judgment Action Against All Defendants" (Count V).  As to this Count, Happy's asks this Court to declare that: 1) the franchise agreements were breached and have been terminated by Happy's; 2) Defendants no longer have a right to use Happy's marks or intellectual property and may not operate a Happy's Pizza® restaurant; 3) Defendants engaged in unfair competition and trademark infringement. (Compl. at 34-35).

Given that the Court is denying Happy's motion as to the breach of contract count, it

---

[2]If Happy's had established that Defendants breached the terms of the Franchise Agreements, the next step would be to look at damages and determine if there are any genuine issues of fact as to them.  As explained above, however, Happy's has not met its burden of establishing that there is no genuine issue of fact for trial as to the alleged breaches.  The Court therefore need not address damages.  Nevertheless, the Court notes that the damages section of Happy's Brief leaves the Court guessing as to where Happy's came up with some of its alleged damages and that this section of the brief (*see* Page 14) does not direct the Court to the *record evidence* that supports the damages requested.  For example, as to both Chicago Partners and Harvey Holdings, Happy's Summary Judgment Motion asserts that it is entitled to $100,0000.00 for "damage to goodwill" without any further explanation.  (Pl.'s Br. at 14).  Happy's also asserts that it should be awarded damages for "rent" although it is undisputed that Happy's is not the landlord for either location.  That is, Chicago Partners and Harvey Holdings signed lease agreements with third parties who are not in this case.  And while the Franchise Agreement makes the franchisee's failure to pay its landlord or third parties for supplies an event of default, Happy's has not identified any provision that states that if that happens then Happy's can make the payment to the landlord or third-party supplier and then recover it from the franchisee. Perhaps there is such a provision in these 57-page Franchise Agreements, but Happy's has not identified it.

would be premature for the Court to entertain any requests regarding declaratory relief.  Such

relief would be more appropriate after a jury trial.

## II.   Is Happy's Entitled To Summary Judgment In Its Favor As To The Counter-Claims Asserted Against It?

In its Motion for Summary Judgment, Happy's also seeks entry of summary judgment in

its favor as to all of the Counter-Claims asserted against it.

### A.   The Breach Of Contract Counter-Claims

Counts I and IV of the Counter-Complaint assert breach of contract claims.  Count I

asserts a breach of contract claim by Green and Chicago Partners, while Count IV asserts a

breach of contract claim by Green and Harvey Holdings.  The body of these counts do not

identify the contract or contracts that were allegedly breached or the specific provisions that they

allege were breached.  Rather they allege that Happy's "has breached the contract by failing to

comply with the terms of the Agreement."  (Counter-Complaint at ¶¶ 30 & 42).

The opening paragraph of the breach of contract count asserted by Green and Chicago

Partners states that it "repeats and realleges each and every allegation contained in paragraphs 10

through 17" of the Counter-Complaint.  Paragraph 14 alleges that "[i]n order to induce [them] to

enter into the Franchise Agreement, Counterdefendant made certain representations where were

untrue."  They then allege a list of representations which they claim are misrepresentations.

Again, the only named Counter-Defendant is Happy's.  Notably, the only contracts that

any of the Counter-Plaintiffs entered into with Happy's are: 1) the Franchise Agreement; and 2)

an Addendum to the Franchise Agreement.  The Counter-Complaint does not identify any

provision of either of those agreements that it alleges Happy's breached. And Green is not a party

27

to either Franchise Agreement, although she signed them as the authorized representative of the entities.

In its Motion for Summary Judgment, Happy's asserts that summary judgment should be granted in its favor because there are no allegations in the Counter-Complaint that could support a breach of contract claim against it.

The Court agrees these counts should be dismissed.

Counter-Plaintiffs' response brief is confused and focuses upon perceived misrepresentations made by Happy Asker. For example, Counter-Plaintiffs assert that "Plaintiff was the first to breach the Franchise Agreements with Mr. Asker's misrepresentations and failure to disclose material facts to the Contract, thereby precluding the Plaintiff from holding any Defendant liable for a subsequent breach, if any." (Resp. Br. at 21). While such allegations may form the basis of a fraud or misrepresentation claim, they do not establish breach of contract claim.

In order to establish a breach of contract claim under Michigan law, the plaintiff must establish the existence of valid contract, the terms of the contract, the specific actions that breached those terms, and the damages that the breach caused to the plaintiff. *Brigolin v. Blue Cross Blue Shield of Michigan*, 516 F. App'x. 532, 536 (6th Cir. 2013) (citing *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003)).

Here, the Counter-Plaintiffs have not even alleged, much less presented evidence to establish, that Happy's breached any provision of the Franchise Agreements.

## B.    The Fraud Counter-Claims

In order to establish a claim of fraudulent misrepresentation under Michigan law, a

28

plaintiff must establish: 1) that defendant made a material misrepresentation; 2) that it was false; 3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; 4) that he made it with the intention that it should be acted upon by the plaintiff; 5) that the plaintiff reasonably relied on it; and 6) and that he thereby suffered injury. *Tocco v. Richman Great Prof. Ass'n*., __ F. App'x. __, 2013 WL 6800985 (6th Cir. 2013) (citations omitted).

"Silent fraud" is essentially the same as fraudulent misrepresentation, "except that it is based on a defendant's suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation." *Tocco, supra*, at *4 (citations omitted). In order to establish a claim for silent fraud, a plaintiff must establish: 1) a pre-existing legal or equitable duty to disclose; 2) suppression of information with the intent to defraud; 3) reasonable reliance upon defendant's performance of the duty; and 4) damages caused by the suppressions of the information. *Id.*

The two fraud counts in the Counter-Complaint (Counts II and V) are based upon alleged fraudulent misrepresentations or silent fraud by Happy's. The body of those counts, however, simply state the elements of the claim, without specifying the alleged misrepresentations or omissions.

The supporting factual allegations that precede the counts allege that, as to Chicago Partners, someone on behalf of Happy's made the following, misrepresentations "in order to induce" Chicago Partners to enter into the Franchise Agreement:

   1)      providing an "accounting statement of Happy Pizza in Chicago" to Green
           that "did not reflect the actual sales in the Chicago restaurant" (Counter-
           Compl. at ¶ 14(a));

> 2)      "the claimed ownership of the real property of Happy Pizza restaurant in
>         Chicago was false because neither Happy Pizza Franchise, LLC, Happy
>         Asker nor Halsted Property, LLC own the property."   (Counter-Compl. at
>         ¶ 14(b);
>
> 3)      not disclosing that Happy's had not paid "all the business license fees, real
>         estate taxes" to the City of Chicago, which resulted in Green being cited
>         by City of Chicago inspectors.  (Counter-Compl. at ¶ 14(c)-(e); and
>
> 4)      Happy's "gave a lease agreement to the Counter-plaintiff [titled a lease
>         agreement between Halsted Property, LLC and Chicago Partners] when
>         Counterdefendant knew that it was a tenant on the property and had no
>         legal standing or authority to issue such a lease agreement and that legal
>         action was pending by the actual owner/landlord to evict
>         Counterdefendant" and that Happy's "negotiated with the Counter-plaintiff
>         for a monthly rental payment of $2,5000.00 but instead created a lease for
>         monthly rental payment of $4,011.18"  (Counter-Compl. at ¶ 14(e)-(f).

Chicago Partners alleges "it would not have entered this transaction for the purchase of the

franchise had [it] been aware of [Happy's] false representations prior to the purchase of the

franchise."  (Counter-Compl. at ¶ 15).  Chicago Partners/Green assert that they have "no interest

in running the Happy's Pizza Franchise anymore and wants her funds [of $117,000.00] to be

returned.  (Counter-Compl. at ¶ 16 & 17).

The supporting factual allegations that precede the counts allege that, as to Harvey

Holdings, someone on behalf of Happy's made the following, misrepresentations "in order to

induce" it to enter into the Franchise Agreement:

> 1)      providing an "accounting statement of Happy Pizza in Harvey" to Green
>         that "did not reflect the actual sales in the Harvey restaurant" (Counter-
>         Compl. at ¶ 22(a));
>
> 2)      "the claimed ownership of the real property of Happy Pizza restaurant in
>         Harvey was false because neither Happy Pizza Franchise, LLC, Happy
>         Asker nor Halsted Property, LLC own the property."   (Counter-Compl. at
>         ¶ 22(b);

30

    3)    Happy's "gave a lease agreement to the Counter-plaintiff [titled a lease agreement between Halsted Property, LLC and Harvey Holdings] when Counterdefendant knew that it was a tenant on the property and had no legal standing or authority to issue such a lease agreement and that legal action was pending by the actual owner/landlord to evict Counterdefendant" and that Happy's "negotiated with the Counter-plaintiff for a monthly rental payment of $2,5000.00 but instead created a lease for monthly rental payment of $3,500.00" (Counter-Compl. at ¶ 14(e)-(f);

Harvey Holdings alleges "it would not have entered this transaction for the purchase of the franchise had [it] been aware of [Happy's] false representations prior to the purchase of the franchise." (Counter-Compl. at ¶ 23). Harvey Holdings /Green assert that they have "no interest in running the Happy's Pizza Franchise anymore and wants her funds [of $119,000.00] to be returned. (Counter-Compl. at ¶ 24 & 25).

### 1.  Fraud Claims Based On Lease Agreements And/Or Ownership Of Leased Premises

Defendants/Counter-Plaintiffs are proceeding as if Happy's Pizza Franchise, LLC – the sole named Plaintiff and Counter-Defendant in this action – is interchangeable with Happy Asker the individual and all of the various business entities that he has an interest in. It is not.

For example, the factual allegations supporting the fraud claims state that Chicago Partners and Harvey Holdings do not wish to operate franchises anymore and want the funds they paid, $117,000.000 and $119,000.00 respectively, refunded to them. But those fees were not paid to Happy's and they were not paid in connection with the Franchise Agreements. Rather, those fees were paid to the two corporate entities that owned the franchise locations and who sold them under Asset Purchase Agreements.[3]

---

[3]Happy's was not a party to the Asset Purchase Agreements. Chicago Partners and Harvey Holding only paid a franchise fee of $35,000 under the Franchise Agreements.

Similarly, the Counter-Plaintiffs did not enter into lease agreements with Happy's. Rather, they entered into lease agreements with entirely different corporate entities, which Happy Asker has an interest in.  Thus, to the extent that the Counter-Plaintiffs assert that those entities claimed that they owned the real property when, in fact they did not and were in arrears on the rent to the actual owner, that is a claim that should have been brought against the entities that signed the lease agreements.

The same is true for the remaining claims relating to the lease agreements.  Counter-Plaintiffs appear to assert that the landlord orally negotiated a lesser monthly rent payment but then included a higher rent payment in the lease agreement, which Counter-Plaintiffs signed anyway.   That is also a claim that should have been brought against the entity that signed the lease agreement.

### 2.        Fraud Claims Based On Accounting Statements

Chicago Partners and Harvey Holdings each allege that Happy's made a misrepresentation to them by providing an "accounting statement of Happy Pizza in Chicago" and an "accounting statement of Happy Pizza in Harvey" to Green that "did not reflect the actual sales" in the Chicago or Harvey restaurants.   The Complaint does not provide any detailed allegations as to what the alleged accounting statements showed, other than to say that they were "false and inflated" and did not reflect the actual sales in the two restaurants.

Notably, however, in the Declaration submitted by Green, *she makes affirmative assertions that belie the allegations in the Counter-Complaint* that Chicago Partners and Harvey Holdings were given statements that inflated the earnings in the two restaurants.  Green states

that, "[p]rior to the sale of the assets of Happy's Pizza Chicago #3, Inc. and HP Harvey Chicago #4, Inc. by Happy Asker to me, Mr. Asker stated to me that the *Chicago and Harvey restaurants were not doing well.*"  (Green Decl. at ¶ 18) (emphasis added).  Asker told Green that they were "*losing money in both restaurants because they were not performing* and wanted to close them." (Green Decl. at ¶ 20) (emphasis added).  Asker gave Green "copies of the Profit and Loss Statements for both restaurants from September 2011 through August 2012." (*Id*. at ¶ 21).  "The Profit and Loss Statements showed that Happy's Pizza Chicago #3, Inc. at the *Chicago location had a net profit of $984.00 for the whole operating year* and that HP Harvey Chicago #4, Inc. at the *Harvey location had a net profit of $3,711.55 for the whole operating year*."  (*Id*. at ¶ 22) (emphasis added).

Thus, the fraud claim based on alleged inflated accounting statements provided prior to entering into the Franchise Agreements fails because, based upon Green's own Declaration, the allegations are untrue.  And there can be no reasonable reliance when Green, the manager of both Chicago Holdings and Harvey Holdings who signed the Franchise Agreements on behalf of the those entities, admits that she was advised that both franchise locations had been losing money and were not profitable before she signed the agreements.

Moreover, the Franchise Agreements that Chicago Partners and Harvey Holdings signed expressly provide that:

> Franchisee acknowledges and agrees that, except as specifically set forth in this Agreement or the Franchisor's Franchise Disclosure Document or the attached "Acknowledgments by Franchisee," *no representations or warranties, express or implied, have been made to Franchisee, either by Franchisor or anyone acting on its behalf or purporting to represent it, including, but not limited to, the prospects for successful operations, the level of business or profits that Franchisee might reasonably expect, the desirability, profitability or expected traffic volume or*

33

> *profit of the Franchise Business.*  Franchisee acknowledges that all such factors are necessarily dependent upon variables beyond Franchisor's control including, without limitation, the ability, motivation and amount and quality of effort expended by Franchisee.  Franchisee acknowledges that neither Franchisor nor any of its agents or representatives have made or are authorized t make any oral, written or visual representations or projections of actual or potential sales, earnings, net or gross profits, operational costs or expenses, prospects or chances of success that are not contained in this Agreement or in the Franchisor's Franchise Disclosure Document.  *Franchisee agrees that it has not relied on and that Franchisor will not be bound by allegations of any representations as to earnings, sales, profits, costs, expenses, prospects or chances of success that are not contained in this Agreement or the Franchisor's Franchise Disclosure Document.*

(Article 17.2 of Franchise Agreement) (emphasis added).  The Franchise Agreements also contain an integration clause:

> *This Agreement and all appendices and other documents attached to this Agreement which are incorporated in this Agreement, will constitute the entire agreement between the parties.  This Agreement supercedes and replaces any and all previous or contemporaneous written and oral agreements or understandings, promises, representations or dealings between the parties.*  However, nothing

(Franchise Agreement at 19.7).

Happy's contends that any claims based upon its alleged misrepresentation via providing an accounting statement for the two franchise's that did not accurately reflect the true sales of those stores, are barred by the terms of the contract and its integration clause.

In response, Counter-Plaintiffs assert that integration clauses are not conclusive evidence that the parties intended the document to be the final and complete expression of their agreement "when dealing with cases of fraud."  (Defs.' Br. at 24).

While the Court need not address this additional ground for dismissing this fraud claim, the case law reflects that the fraud exception that Counter-Plaintiffs wish to invoke only goes to claims that the *integration clause itself* was obtained through fraud.  *See Cook v. Little Caesar*

34

*Ent., Inc.*, 210 F.3d 653, 656 (6th Cir. 2000) ("Recently, the Michigan Court of Appeals has held 'that when the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidates the integration clause or where an agreement is obviously incomplete on its facts and, therefore, parol evidence is necessary for the filling of gaps.'").

3.      **Fraud Claims Based On Happy's Not Disclosing That It Had Not Paid Licensing Fees And Real Estate Taxes**

Chicago Partners asserts a fraud claim based upon Happy's not disclosing that it had not paid "all the business license fees, real estate taxes" to the City of Chicago for the franchise.

The Franchise Agreements that Chicago Partners and Harvey Holdings entered into with Happy's, however, expressly provide that the franchisee, not the franchisor, is responsible for paying any state, federal, or local taxes and license fees for the franchise.  (*See* Franchise Agreement at Articles 7.4 and 8.13).  Because Happy's has no obligation to pay any taxes or licenses for the franchise, the Court fails to see how its failure to disclose that it has not paid taxes or licenses for the franchise can form the basis for an actionable silent fraud claim.

Chicago Partners may have been able to assert such a claim against the non-party entity who sold it the franchise under the Asset Purchase Agreement, if it made certain representations about the status of taxes and compliance with laws (*see* Asset Purchase Agreements at §§4.13 & 4.14), but again, Happy's was not a party to that lease agreement.

C.      **The Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

Although Count VII of the Counter-Complaint is untitled, the body of its reflects that it asserts a claim for breach of the implied covenant of good faith and fair.

35

Although Happy's motion did not specifically address this claim, the shall address it because regardless of whether Michigan or Illinois law applies, the claim fails as a matter of law.

Pursuant to Fed. R. Civ. P. 56(f), the Court may grant summary judgment on grounds not raised by a party, so long as it gives notice and an opportunity to respond to the issue.

With one very narrow exception, that is not alleged and does not apply here,[4] Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing. *See Coyer v. HSBC Mort. Serv. Inc.*, 701 F.3d 1104, 1108 (6th Cir. 2012) ("Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing.") (quoting *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463 (2003)).

And the claim would not fare any better if Illinois law were to apply. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (noting that the Illinois Supreme Court has held that "breach of the covenant of good faith and fair dealing is not an independent cause of action under Illinois law except 'in the narrow context of cases involving an insurer's obligation to settle with a third party who has sued the policy holder.'").

The Court therefore raised this issue at oral argument and gave Counter-Plaintiffs the opportunity to respond. Counsel for Counter-Plaintiffs acknowledged, at oral argument, that this claim fails as a matter of law.

Accordingly, the Court shall DISMISS Count VI of the Counter-Complaint.

---

[4]"An implied covenant of good faith and fair dealing in the performance of contracts is recognized by Michigan law only where one party to the contract makes it performance a matter of its own discretion." *Dietrich v. Bell, Inc.*, __ F. App'x. __, 2014 WL 503467 (6th Cir. 2014).

**CONCLUSION & ORDER**

For the reasons set forth above, IT IS ORDERED that Happy's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED to the extent that the Court  DISMISSES the Counter-Complaint with prejudice.  The motion is DENIED in all other respects.

IT IS SO ORDERED.


S/Sean F. Cox_____
Sean F. Cox
United States District Judge

Dated:  April 3, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 3, 2014, by electronic and/or ordinary mail.

S/Jennifer McCoy_____
Case Manager